**UNITED STATES of America ex rel. William HAYWARD, Appellant,**

v.

**Robert L. JOHNSON, Superintendent State Correctional Institution, Graterford, Pennsylvania, Appellee.**

**No. 74–1335.**

United States Court of Appeals, Third Circuit.

Argued Nov. 15, 1974.

Decided Jan. 28, 1975.

Robert Scandone, Brobyn, Forceno,
Curran & Scandone, Philadelphia, Pa.,
for appellant.

Bonnie Brigance Leadbetter, Mark Sendrow, Steven H. Goldblatt, Abraham J. Gafni, Richard A. Sprague, F. Emmett Fitzpatrick, Jr., Philadelphia, Pa., for appellee.

Before VAN DUSEN, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This case, an appeal from an order denying habeas corpus relief, presents us with one of the most difficult tasks in the law: that of determining whether a confession obtained after custodial police interrogation was voluntary.

Appellant William Hayward, a seventeen-year old drug addict with a tenth grade level of education, was indicted for murder, aggravated robbery and conspiracy for his alleged role in the death of a Mr. William Smith. Prior to the start of his trial, Judge Joseph L. McGlynn, Jr., of the Pennsylvania Court of Common Pleas held a suppression hearing on the admissibility of the confession. After a ruling that the confession was admissible, appellant was brought to trial, convicted of aggravated robbery and conspiracy and sentenced to 6–20 years' imprisonment. His conviction was sustained on appeal, and he thereupon sought habeas corpus relief in the Eastern District of Pennsylvania. Although a federal magistrate recommended an evidentiary hearing, the district court denied relief without holding such a hearing.

Appellant makes two principal contentions in challenging the admissibility of his confession. First, he argues that the undisputed facts determined at the suppression hearing compel a finding that his confession had been obtained involuntarily. Second, he argues that the district court at least should have held an evidentiary hearing to resolve disputed issues of fact concerning the voluntariness of his confession which he asserts were inadequately adjudicated by the state court during the suppression hearing. We reject both contentions and affirm the judgment below.

### I.

With respect to the first contention, the uncontested facts, based on testimony from the suppression hearing, are as follows: The decedent, William Smith, was discovered by a neighbor in a badly beaten condition and was taken to the hospital, where he died on September 15, 1970. Appellant was questioned on three separate occasions with respect to Smith's death, each time in a small interrogation room at the police station and each time after receiving the full *Miranda* warnings. Although the police never had a warrant when they took him into custody, he went voluntarily and with his mother's permission each time he was questioned.

The first questioning occurred on September 21, 1970, when Detective Kelly of the Philadelphia police picked appellant up at his home at 2:30 p. m. At the police station, he was questioned initially for about one hour. During this questioning, he admitted knowing the decedent, but gave a generally exculpatory statement. After voluntarily submitting to a lie detector test, which he failed, appellant was questioned for another forty minutes. That period of questioning was terminated when appellant began to suffer withdrawal symptoms and became quite ill. The police then drove him home.

The second occasion on which the police questioned appellant was September 24, after picking him up at his home at 6:20 a. m.[1] On this date, appellant changed his story somewhat and stated that he observed two others (Len and Nelson Johnson) take money from Smith and beat him. However, appellant continued to deny any involvement in the incident. Although the questioning was concluded at 8:00 a. m., the police kept

---

1. Detective Kelly testified that he picked appellant up at that hour in order to be sure to find him at home, since following the first day of questioning he had been eluding the police.

appellant at the station while they went over his story. At 1:00 p. m., he again began to suffer from withdrawal symptoms, and was again driven home.

On October 3, the third time appellant was questioned, he gave his confession. He was picked up at his home at 12:30 a. m.[2] and driven to the police station, where he arrived at 1:10 a. m. From 1:25 a. m. to 2:40 a. m. he gave an oral statement in which he admitted that he had suggested robbing Smith and that he shared in the proceeds. After a twenty minute recess during which he went to the lavatory, he gave a six-page written statement from 3:00 a. m. to 4:50 a. m., and he signed every page.[3] Subsequently,[4] however, he again suffered withdrawal symptoms, becoming so ill that he was taken to the hospital in an emergency patrol wagon. While at the hospital, he was examined by Dr. B. Duvall, who reported that appellant told him that he would rather die than go into withdrawal and that he had tried to commit suicide four times while at the police station. This report was admitted into evidence at the suppression hearing.

At the conclusion of the testimony and arguments by counsel, Judge McGlynn made the following findings:

I will find as a fact that [Hayward] was advised of his constitutional rights; that he understood them; that he freely and voluntarily made the statement, and it was not the result of either physical force or psychological duress; that the fact that he later on suffered withdrawal does not affect the voluntariness of the statement.

■■■ Since it is evident from this excerpt that Judge McGlynn made both factual and legal findings, it is necessary to distinguish between them in order to determine the scope of our review. The purely factual findings—that appellant was warned of his rights and that he understood them, and that he suffered withdrawal after giving his statement— are binding on us, since we are satisfied that sufficient evidence exists to support them and since they are not contested on appeal.[5] The remaining findings, which pertain to the voluntariness of the statement, are at least mixed questions of law and fact, and they do not foreclose our independent review. We are in fact

---

**2.** No explanation was given for picking up appellant at this hour. *Cf.* note 1, *supra.*

**3.** At the suppression hearing, there was a conflict in testimony as to whether appellant read each page before signing it. Detective Kelly testified that appellant did read every page, but appellant testified that he had signed each page without reading it. While Judge McGlynn did not resolve this factual discrepancy, appellant does not argue on appeal that he signed the statement without reading it.

**4.** Judge McGlynn implicitly found that appellant did not go into withdrawal until after giving his statement, since he found *inter alia* "that the fact that [appellant] *later on* suffered withdrawal does not affect the voluntariness of the statement." (Emphasis added.) We believe that the record contains ample support for this implicit finding. While appellant testified at the suppression hearing, in response to a leading question, that he felt sick when he signed the statement, he admitted that he did not begin to vomit until around 8:00 or 9:00 a. m., several hours after

signing it. He also admitted that he was "normal" when he arrived at the police station, that he had taken a "fix" before going to bed that night and that he would not have taken his next "fix" until after arising at 6:30 a. m.

Furthermore, Detective Kelly testified at the suppression hearing that appellant appeared alert and responsive throughout the entire questioning and had not shown any signs of illness. Detective Gold, another officer who replaced Detective Kelly later that morning, testified that appellant appeared normal when he first saw him at 10:50 a. m. and when he saw him later at 12:00 noon, and that he did not complain of feeling sick until 12:30 p. m. Finally, we note that appellant does not contend on appeal that he was experiencing withdrawal symptoms at the time he gave his statement, and in fact he appears to concede that he went into withdrawal several hours after giving the statement. (Appellant's brief, pp. 19, 20).

**5.** *See* note 4, *supra.*

obligated to make our own determination on the basis of the uncontested .facts[6] and the specific factual findings supported by the record, as to whether appellant's statement was voluntarily given. Haynes v. Washington, 373 U.S. 503, 515, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Malinski v. New York, 324 U.S. 401, 404, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); Ashcraft v. Tennessee, 322 U.S. 143, 147–148, 64 S.Ct. 921, 88 L.Ed. 1192 (1944).

■■ In determining whether a confession was voluntary, we must satisfy ourselves that the confession was "the product of an essentially free and unconstrained choice by its maker,"[7] that it was "the product of a rational intellect and a free will"[8] and that the appellant's will was not "overborne."[9] In making this determination, it is essential for us to consider the "totality of the circumstances" surrounding the obtaining of the confession. Schneckloth v. Bustamonte, 412 U.S. 218, 226–227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Haynes v. Washington, *supra* at 513–514 of 373 U.S., 83 S.Ct. 1336.

Applying these standards, we acknowledge that this is a close case, and we are troubled by the police conduct here, involving a late night questioning, without any apparent justification,[10] of a seventeen-year old youth. We also acknowledge that the Supreme Court's decision in Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1947), on which appellant relies, is in some respects similar to the case before us. In that case, the Supreme Court held involuntary the confession of a fifteen-year old boy who was taken from his home at night and questioned steadily from 12:00 midnight to 5:00 a. m.

■ However, we believe that *Haley* is distinguishable, and we are satisfied that the Commonwealth of Pennsylvania has sustained its burden of proving, by a preponderance of the evidence,[11] that appellant's confession was voluntarily given. One important distinction is the fact that the youth in *Haley* was never informed of his right to remain silent or to have a lawyer present,[12] whereas in this case appellant was read all four *Miranda* warnings prior to each questioning. On October 3, he was read those warnings twice, once before the initial questioning and again before giving his written statement. In addition, each time he was read the warnings, he was also asked a series of questions from the standard police interrogation card,[13] and

6. Culombe v. Connecticut, 367 U.S. 568, 603–604, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Haley v. Ohio, 332 U.S. 596, 597–598, 68 S.Ct. 302, 92 L.Ed. 224 (1947). Of course, our inquiry is limited to the undisputed facts only if we find, as we do *infra,* that appellant had been afforded a full and fair evidentiary hearing by the state court. *See* Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

7. Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

8. Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).

9. Reck v. Pate, 367 U.S. 433, 440, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961).

10. *See* note 2 *supra.*

11. Lego v. Twomey, 404 U.S. 477, 487–489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

12. The defendant in *Haley* was informed of his "rights" only after he had orally confessed, and he was so informed by means of an abbreviated and formalized recitation of his "rights" in the written confession which he signed. The Court justifiably treated this as inadequate. *Haley, supra,* 332 U.S. at 598, 601, 68 S.Ct. 302.

13. Those questions were as follows: "Do you understand that you have the right to keep quiet, and do not have to say anything at all?" "Do you understand that anything you say can and will be used against you?" "Do you want to remain silent?" "Do you understand that you have the right to talk with a lawyer before we ask you any questions?" "Do you want to talk with a lawyer at this time or to have a lawyer with you while we ask you questions?" "Are you willing to answer questions of your own free will without force or fear or without any threats or promises having been made?"

Detective Kelly testified at the suppression hearing that he read all these questions to appellant each time he questioned him, and appellant neither contested his assertion at the suppression hearing nor contests it now on appeal.

all his responses indicated that he was willing to talk without delay and without the assistance of counsel. Neither at the suppression hearing nor on appeal does appellant challenge the sufficiency of his warnings or deny a willingness to talk without an attorney present.

We recognize that the giving of such warnings is but one factor in the "totality of circumstances" that we must consider, albeit an important one, and we certainly do not suggest that a confession obtained after a suspect has been fully informed of his rights can never be found involuntary.[14] However, there are additional factors in this case which further distinguish it from *Haley* and which likewise point toward voluntariness. First, the period of questioning was shorter and the manner of questioning seems less coercive. Unlike the youth in *Haley*, who gave his confession only after five hours of continuous incommunicado questioning by five or six policemen in relays of one or two each, appellant here began to give his confession early on the third occasion he was questioned,[15] and the questioning was conducted predominantly by one person, Detective Kelly.[16]

Furthermore, the confession was obtained only on the third occasion he was questioned. By October 3, the circumstances of his questioning and the setting at the police station must have appeared less novel and intimidating; after two previous questionings he had been sent home, where he had the opportunity, unpressured by the police, to consider his situation; he was fully informed that the police were investigating his possible role in the death of William Smith;[17] and he was surely aware that the police had twice released him without obtaining a confession. Therefore, since he had been subjected to unfamiliar surroundings on two prior occasions and yet had withstood lengthy questionings without confessing, we find it difficult to conclude that he was not acting voluntarily on October 3, when he began giving his oral incriminatory statement shortly after arriving and completed giving it within an hour and fifteen minutes of questioning. Finally, unlike the Supreme Court in *Haley*, we find no evidence of a callous disregard of appellant's rights by the police after he gave his confession which might cast suspicion on their conduct throughout the questioning.[18]

Appellant places considerable emphasis on an additional factor in his case which he believes makes it stronger than *Haley* —the fact of his drug addiction and the undisputed seriousness of his withdrawal symptoms. However, we believe that this additional factor carries little weight in support of his contention that his confession was involuntary. As we noted earlier,[19] the evidence at the suppression hearing indicates that appellant did not go into withdrawal until several hours after he had given both his oral and written confession, and he does not argue the contrary on appeal. Rather, his position is that his fear of oncoming withdrawal was so great that his will was overcome and that he gave a statement he hoped was satisfactory in order

---

14. *Cf.* United States v. Guaydacan, 470 F.2d 1173 (9th Cir., 1972), where the Ninth Circuit concluded that a confession was involuntarily obtained despite the giving of the *Miranda* warnings.

15. According to the testimony of Detective Kelly, appellant completed giving his oral statement within one hour and fifteen minutes of questioning (from 1:25 a. m. to 2:40 a. m.). While appellant's testimony diverged somewhat (he stated, in response to a leading question, that he signed the *written* statement at 3:00 a. m.), it reinforces the conclusion that appellant confessed rather quickly on October 3.

16. At the suppression hearing, appellant did testify that on a few occasions Detective Thornton came into the room, once to threaten him. While Detective Thornton did not testify at the suppression hearing, Detective Kelly denied that any threats or promises had been made, and appellant does not argue on appeal that he was ever threatened.

17. *Cf.* Collins v. Brierly, 492 F.2d 735, 739 and n. 9 (3d Cir., 1974).

18. *See Haley, supra,* 332 U.S. at 600, 68 S.Ct. 302.

19. *See* note 4, *supra.*

to be relieved of the "oppression" of withdrawal.

We find this position unconvincing. It seems that the only way appellant could have believed he would be relieved of his plight after giving a "satisfactory statement" would be if he expected to be released from custody in order to take another "fix."[20] Yet it is unrealistic to conclude that appellant could have believed that he was gaining his speedier release and easing his predicament by admitting to participation in a robbery which led to the victim's death. Furthermore, he had gone into withdrawal twice before without confessing. Finally, on the two prior occasions when he went into withdrawal, appellant was promptly taken home, and he had no reason to believe that the same would not happen on October 3.

We therefore conclude that the uncontested facts of this case do not compel a finding of involuntariness. Viewing the record in its totality, we believe that a combination of factors—the full *Miranda* warnings, the speed with which appellant confessed on October 3,[21] his familiarity by that date with police practices,[22] his refusal to confess during the two prior interrogations, and the fact that he did not go into withdrawal until several hours after confessing—satisfies us that his confession on October 3 was the product of an essentially free choice.

## II.

■ We now turn to appellant's second principal contention—that the district court should have held an evidentiary hearing before passing on the merits of appellant's habeas corpus claim. The district court declined to hold such a hearing, after reviewing the record of the suppression hearing and concluding that:

> Relator was afforded a full and fair evidentiary hearing in the State Court. All essential and material facts were presented and developed during the state suppression hearing.

Appellant's principal contention here is that the state suppression hearing failed to adjudicate adequately a major issue of fact: what his mental condition was at the time he gave his confession on October 3. However, we agree with the district court that all the essential facts relevant to this issue were presented before the state court. Consequently, we believe that both the district court and this court can adequately assess appellant's claim of involuntariness without the necessity for a new hearing.

A review of the transcript of the suppression hearing indicates that appellant testified about his addiction and stated that he was "scared" during the questioning; the reports of two doctors from Philadelphia General Hospital (Dr. Paes and Dr. B. Duvall, the latter a psychiatrist) were introduced into evidence, and they referred to appellant's addiction, his fear of withdrawal and his suicidal tendencies; and defense counsel argued strenuously that appellant's will was overborne because of his fear of withdrawal. Judge McGlynn also heard the testimony of the police officers that appellant appeared normal[23] and alert both during and shortly after the questioning. Given this testimony and the uncontested facts recounted earlier, we believe that the suppression hearing adequately developed all the facts material to determining whether appellant's will was overborne at the time he made his confession, and that we therefore can make such a legal determination ourselves

**20.** Appellant in fact testified at the suppression hearing that the police had told him that he would be released if he signed the statement.

**21.** *Cf.* United States ex rel. Rush v. Ziegele, 474 F.2d 1356, 1359–1360 (3d Cir., 1973), where we held voluntary the confession, after four hours of questioning, of a defendant who had a history of mental illness, even though he had *not* been given any *Miranda* warnings.

**22.** *Cf.* Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); Stein v. New York, 346 U.S. 156, 185–186, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953).

**23.** Appellant himself admitted that he was "normal" at the beginning of the questioning.

without holding a new evidentiary hearing. Like both the state trial court and the district court, we make the legal conclusion that appellant's fear of oncoming withdrawal, which we fully acknowledge to have been a grave one, was not sufficient, given the totality of circumstances, to render his confession involuntary.

The only basis on which appellant attacks the suppression hearing is his assertion that "The record is devoid of expert medical evidence of what relator's condition must have been at that time." However, since no doctor examined appellant at the time he gave his confession, any new medical testimony introduced now at a district court hearing, more than four years after the event, would appear to have little probative value. Furthermore, since we acknowledge that appellant feared going into withdrawal but still conclude that the confession was voluntary, in part because he suffered withdrawal twice before without confessing, we question the relevance of any further testimony along this line.

■ We acknowledge that Judge McGlynn's "findings" were extremely abbreviated and that he failed to evaluate the testimony, to make findings of credibility and to resolve certain discrepancies in the testimony. However, the failure of a state court to make explicit findings does not necessarily require a new evidentiary hearing. LaVallee v. Della Rose, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973); Townsend v. Sain, 372 U.S. 293, 314–315, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). In this case, we note that appellant does not base his appeal on grounds to which the failure to make such explicit findings would be relevant, and he is not alleging a failure to resolve discrepancies in the testimony.[24] Rather, the only asserted deficiency in the hearing was the failure to hear medical testimony which might corroborate his assertion that the fear of oncoming withdrawal was so great as to render his confession involuntary. For the reasons expressed earlier, we do not believe that the failure to hear such testimony requires a new evidentiary hearing.

It is true that under *Townsend, supra,* a district court has the power in its discretion to hold an evidentiary hearing even when not required to do so. However, because we question the probative value of new medical testimony regarding appellant's state of mind at the time he gave his confession and before he went into withdrawal (the only basis on which appellant seeks an evidentiary hearing), we cannot say that the district court's refusal to hold such a hearing was an abuse of discretion warranting reversal.

### III.

■ Appellant makes two additional contentions which we can dispose of quickly. The first is that suppression of the statement is required by the unnecessary delay between arrest and arraignment proscribed by Pennsylvania Rule of Criminal Procedure 130, 19 P.S. Appendix.[25] Even assuming that Rule 130 applies to this case and that it would require suppression of the statement by a state court,[26] we do not believe that a

24. We have already noted that Judge McGlynn implicitly found that appellant did not suffer withdrawal until after making his confession, and that that finding is supported by the record and is not contested on appeal. *See* note 4, *supra.*

25. This rule provides:

When a defendant has been arrested without a warrant in a court case, he shall be taken without unnecessary delay before the proper issuing authority where a complaint shall be filed against him and he shall be given an immediate preliminary arraignment.

The Pennsylvania courts have construed this rule as requiring the suppression of evidence obtained after an unnecessary delay between the arrest and the obtaining of the evidence. *See, e.g.,* Commonwealth v. Cherry, Pa., 321 A.2d 611 (1974); Commonwealth v. Tingle, 451 Pa. 241, 245, 301 A.2d 701, 703 (1973); Commonwealth v. Futch, 447 Pa. 389, 290 A.2d 417 (1972).

26. We note that the Rule applies only to an unnecessary delay between *arrest* and arraignment, and Detective Kelly gave uncontradicted testimony that appellant was not placed under arrest until after he gave his

violation of the Rule can afford a basis for habeas corpus relief in federal court. Appellant appears not to have raised this issue at the state level, and thus he cannot raise it for the first time in habeas corpus proceedings. Picard v. Connor, 404 U.S. 270, 275–276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Most important, habeas corpus relief is only available to a person held "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), and thus a state procedural error simply does not provide a basis for federal habeas corpus relief.[27] While an unduly long delay between arrest and arraignment may give rise to a constitutional claim, it may do so not because of a violation of a procedural rule, but because the undue delay may support a finding that the confession was coerced. See Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949). However, we have already rejected appellant's claim of coercion.

■ Appellant's final contention is that his inculpatory statement was the only evidence linking him to the crime and that his conviction should therefore be reversed for lack of corroboration. Appellant in fact appears to be making

two arguments here, but we believe that neither of them has merit. First, he argues that there was insufficient evidence to support a jury inference that the confession was truthful. He also appears to contend that the lack of corroboration violates the *corpus delicti* rule. Assuming *arguendo* that each contention is cognizable on habeas corpus,[28] we believe that there was sufficient corroboration for either purpose. Appellant's confession demonstrated detailed knowledge of the place and circumstances of the offenses committed. The victim's manner of death, while not proven to be by criminal agency, was consistent both with criminal agency in general and the particular manner described by appellant in his statement. Finally, the statement implicated Nelson Johnson, whom the victim appears to have named before dying.[29] We believe that these facts tend to "fortify the truth of the confession," Opper v. United States, 348 U.S. 84, 92, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954), and thus both satisfy the *corpus delicti* rule and provide sufficient evidence for the jury to conclude that the statement was truthful.

The judgment of the district court will be affirmed.

---

statement. Detective Kelly also gave uncontradicted testimony that appellant went to the station on each occasion voluntarily and with his mother's permission. We do not know whether the Pennsylvania courts would conclude that, for purposes of Rule 130, appellant had been "arrested" prior to formally being placed under arrest or that the facts of this case would evidence an unnecessary delay between "arrest" and arraignment.

**27.** While the Supreme Court has fashioned a rule that an unnecessary delay between arrest and arraignment in violation of Fed.R.Crim.P. 5(a) requires suppression, Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1947); McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), the Supreme Court made it clear that this rule is not constitutionally-based, but rather was formulated in the exercise of its supervisory powers over prosecutions in the federal

courts. *McNabb, supra* at 340–342, 63 S.Ct. 608.

**28.** The Supreme Court has held that a constitutional claim regarding sufficiency of the evidence arises only when there is *no* evidence to support a crucial element of the charge. *See, e.g.,* Vachon v. New Hampshire, 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974); Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). Similarly, the *corpus delicti* rule has never been termed a constitutional requirement, but rather has been described as a "general rule that . . has been consistently applied in the lower federal courts and in the overwhelming majority of state courts . . .." Smith v. United States, 348 U.S. 147, 152–153, 75 S.Ct. 194, 197, 99 L.Ed. 192 (1954).

**29.** When the victim was first discovered, he said, "Don't hit me no more Nelson."